IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 22, 2017 Session

IN RE ISABELLA G. ET AL.

Appeal from the Juvenile Court for Rutherford County
No. TC2512T        Donna Scott Davenport, Judge

_____

No. M2016-02105-COA-R3-PT

_____

Parents appeal the termination of their parental rights to their two children. The juvenile court found clear and convincing evidence of five grounds against the father and three grounds against the mother and that termination of parental rights was in the children's best interest. DCS concedes on appeal that persistence of conditions was not an appropriate ground for terminating mother's parental rights and that abandonment by failure to visit was not an appropriate ground for terminating father's parental rights. We agree. As to the remaining grounds, we conclude that DCS failed to prove abandonment by failure to provide a suitable home and persistence of conditions as to the father. But the record contains clear and convincing evidence to support the grounds of abandonment for wanton disregard for the welfare of the children and substantial noncompliance with the requirements of the permanency plans as to both parents. We further conclude that the record contains clear and convincing evidence that termination is in the children's best interest. Thus, we affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed as Modified**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Carl Moore, Murfreesboro, Tennessee, for the appellant, Kimberly N.

Brandon M. Booten, Murfreesboro, Tennessee, for the appellant, Daniel G.

Herbert H. Slatery III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I.

### A. Factual and Procedural Background

Kimberly N. ("Mother") and Daniel G. ("Father") are the parents of Isabella G. and Jaxson G., born in November 2012 and October 2013, respectively. Almost from the moment of Jaxson's arrival, the Tennessee Department of Children's Services ("DCS") was involved with the couple and their children. Jaxson tested positive for opiates at birth. But DCS closed its investigation after it was unable to locate the parents.

On May 8, 2014, DCS received a second referral alleging drug exposure of the children.[1] On this occasion, DCS located the parents and children in an extended stay hotel. Both parents tested positive for oxycodone, opiates, and benzodiazepines.

Because of the parents' drug use and environmental concerns, DCS referred the family for the Therapeutic Intervention, Education, and Skills or "TIES" program.[2] Among other things, the program required the parents to complete an alcohol and drug assessment and submit to random drug screens. After the initial drug screen, from May 2014 through July 2014, Mother failed three out of three random drug screens, while Father failed two out of five.

On August 19, 2014, DCS received another referral regarding the children, this time for abandonment. Mother was incarcerated, and Father and the children had moved in with his mother, the children's paternal grandmother, and her husband. Father had left, according to his mother, to be with Mother upon her release from jail, but he had been gone for two days. Father's mother did not want to continue to care for the children without Father's participation.

Unable to locate the parents or to find other possible family placements for the children, DCS removed the children from the home. At the time of removal, Jaxson had eczema all over his body, and carpet pieces were embedded into his skin. Isabella had severe dental problems, which ultimately required six crowns and four composite restorations for her teeth.

---

[1] Mother has another son, who is not at issue in this appeal.

[2] The TIES program "provides intensive family preservation services to parents of children, ages 0-18, who are at risk of losing custody because of alcohol or substance use issues or who have a child in state custody who will be returning to the home within 72 hours." Therapeutic Intervention, Education and Skills (TIES) Brochure, available through the Tennessee Department of Mental Health and Substance Abuse Services website, www.tennessee.gov/behavioral-health/article/therapeutic-intervention-education-and-skills-ties-program.

On August 22, 2014, in the Juvenile Court for Rutherford County, Tennessee, DCS filed a petition for dependency and neglect and for emergency temporary legal custody of the children. The court issued an ex parte protective custody order that same day. The court did allow the parents, who by this time had been located, a minimum of four hours of supervised visitation per month conditioned upon passing a drug screen prior to the scheduled visit.

In separate hearings due to the parents' incarceration, the court adjudicated the children dependent and neglected. Father stipulated that the children were dependent and neglected due to his residential instability, financial instability, and incarceration. Mother stipulated that the children were dependent and neglected due to residential instability, financial instability, and drug exposure. Both parents also agreed that the children should remain in DCS's custody.

On August 26, 2015, DCS filed a petition to terminate parental rights of both Mother and Father to their two children. The petition alleged five statutory grounds: abandonment for failure to visit by an incarcerated parent, abandonment by wanton disregard for the welfare of the children by an incarcerated parent, abandonment for failure to provide a suitable home, substantial noncompliance with the permanency plans, and persistence of conditions. The juvenile court conducted a trial on the petition over the course of four days in March 2016.

## B. PROOF AT THE HEARING

1. Permanency Plans

Following the children's removal, DCS, with the parents' participation, developed three permanency plans. The first permanency plan was created on September 5, 2014, with the goal of returning the children to the parents. The second permanency plan, developed approximately six months later on March 4, 2015, added a second goal, adoption. While the parents participated in the development of the second plan, they objected to adding adoption of the children as a goal. The third and final permanency plan was developed on September 3, 2015, after the termination petition had been filed.

At trial, Father acknowledged that he made no progress toward fulfilling the requirements of the permanency plans until the fall of 2015. In Father's words, "I would absolutely own that I did nothing for the first year" after removal of his children. Mother also acknowledged that she did not get much accomplished after her children were removed. Both parents attributed their lack of progress on the requirements of the first and second plans to homelessness and lack of a support system.

3

The parents remained homeless the first year of the children's removal into state custody. But Mother and Father were also in and out of jail. Prior to the children's removal into state custody, Mother pled guilty to two counts of fraudulently using a credit card over $1,000 and one count of driving under the influence.

Even after the children's removal into state custody, Mother continued to engage in criminal behavior. From November 2014 through June 2015, Mother was arrested for and pled guilty to forgery between $1,000 and $10,000; attempted forgery between $1,000 and $10,000; indecent exposure; and three separate instances of public intoxication. Mother's probation was revoked on August 20, 2015, and she was sentenced to serve six months. She was released from jail mid-December 2015.

A DCS caseworker testified Father was arrested on September 27, 2014.[3] According to Father, he realized that he was addicted to alcohol when he got "arrested four times in a six-month span," from March to July 2015, for public intoxication and indecent exposure. Although one public intoxication charge was eventually dismissed, Father pled guilty to two charges of public intoxication and one charge of indecent exposure during this time. Father was incarcerated from July 24 until August 12, 2015, shortly before the petition for termination of parental rights was filed.

Progress toward fulfillment of permanency plan requirements only really began after the petition for termination of parental rights was filed. Father became involved with "Doors of Hope," a program for individuals reentering society after incarceration, following his release from jail. He began living at the Doors of Hope halfway house, and in September 2015, he started a job.

Mother completed parenting classes in November 2015 while she was in jail. Upon her release from jail, Mother began living in a Doors of Hope shelter for women. By late January 2016, with the assistance of Doors of Hope, Mother and Father moved into a partially furnished, two-bedroom/two-bath townhouse. And, on February 1, 2016, they entered into a one-year lease for the property with a third-party.[4]

Mother and Father continued working on their permanency plan responsibilities even after trial had already begun. On March 14, they submitted a modified budget, which reflected income from the job Mother started in January. Parents also submitted paycheck stubs from February and March.

---

[3] The record does not reveal what led to this arrest. At trial, Father did not dispute that he was arrested on this date.

[4] The third-party is a supporter of and a volunteer for the Doors of Hope program. The townhouse is leased at a below-market rate.

4

Between the second and third days of trial, Mother and Father purchased a car. The majority of funds for the purchase came from charitable contributions. Mother also completed an intensive outpatient program for substance abuse.

2. Parents' Visitation and Relationship with the Children

Mother and Father visited the children only sporadically, either because they failed drug screens prior to the scheduled visit, they were incarcerated, or visits were cancelled because of sickness or the weather. Mother and Father at times would not reschedule the missed visits, which were required to be supervised. At a minimum, Mother and Father were entitled to two monthly visits of two hours each, provided that each could pass a drug screen.

Although the children were removed on August 19, 2014, visitation did not begin until October 2014 because of failed drug screens. Both parents attended Isabella's dental surgery in October 2014, and Father had an additional visit with the children in the same month. No visit occurred in November because both parents were incarcerated. Both parents visited in December 2014 but were late.

In 2015, Father visited from February through April. He did not have another visit until October 2015. Father had two visits in November 2015. Mother, on the other hand, had no visits with the children in 2015.

In February 2016, both Mother and Father visited with the children. The children were hesitant to go to Mother because they had not seen her since December 2014. When the older child, Isabella, referred to her foster parents as "mommy" and "daddy," Father became visibly upset.

Mother and Father admitted that they had paid no child support. According to Mother, she had the ability to pay since January 2016 but that she had not been asked to pay any support. Father testified that, in 2015, he brought presents and a card for Jaxson for his birthday but not Isabella's, which occurred a month later. Father also testified that he bought the children presents for Christmas 2015 but never gave them to the children because something happened with the visits.

C. THE JUVENILE COURT'S RULING

On June 24, 2016, the court reconvened for the purpose of announcing its ruling, findings of fact, and conclusions of law. Before announcing its decision, Mother's counsel orally requested to reopen the proof so that Mother could show her progress in the three months since proof had been closed. DCS opposed the request. Because Mother's counsel could cite no legal authority for reopening the proof, the juvenile court denied the motion.

On September 26, 2016, the court entered a final order terminating the parental rights of Mother and Father to the children.[5] The trial court terminated Father's parental rights on all of the alleged grounds. As to Mother, the trial court found the grounds of (1) abandonment by wanton disregard for the welfare of the child by an incarcerated parent, (2) substantial noncompliance with the requirements of the permanency plans, and (3) persistence of conditions. The trial court also determined that termination of parental rights was in the children's best interest.

## III.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, they must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, the parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d at 596. "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

---

[5] An amended order terminating parental rights was entered on January 4, 2017, which included pages inadvertently omitted from the September 26, 2016 order as found in the record.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). Additionally, as this Court has recently explained, "[w]hen the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Thus, this Court gives great weight to the credibility accorded to a particular witness by the trial court. *Whitaker*, 957 S.W.2d at 837.

In termination proceedings, "the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007). We "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016).

## A. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

As an initial matter, DCS concedes on appeal that the grounds of abandonment for failure to provide a suitable home and persistence of conditions were not appropriate against Mother and the ground of abandonment by failure to visit was not appropriate against Father. After reviewing the record, we agree.[6] Accordingly, we vacate the trial

---

[6] As noted by DCS and discussed further below, for the ground of abandonment for failure to provide a suitable home to apply against the parent, the child must have "been removed from the home of the parent." Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2017). Similarly, for the ground of persistence of conditions to apply to a parent, the child must "ha[ve] been removed from the home of the parent." *Id.* § 36-1-113(g)(3). Here, the proof showed that the children were removed from the home of Father, who was living with his mother at the time. At the time of removal, Mother was incarcerated.

The ground of abandonment for failure to visit by an incarcerated parent applies when the parent failed to visit "for four (4) consecutive months immediately preceding the parent's . . . incarceration." *Id.* § 36-1-102(1)(A)(iv). Here, from the time of removal until the filing of the petition for termination of parental rights, Father was never free for a consecutive four-month period. Since the trial was held, the statutory definition of "abandonment" for failure to visit by an incarcerated parent has changed to provide the following:

court's findings on the grounds for termination conceded by DCS and discuss below only the grounds that DCS defends on appeal.

1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (2017) (defining the term "abandonment"). The juvenile court concluded that Father abandoned the children under both the second and the fourth definitions and Mother abandoned the children under the fourth definition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii), (iv).

a. Failure to Provide a Suitable Home

We first consider whether Father abandoned the children by failing to provide a suitable home. A child has been abandoned under the second statutory definition if the child has been removed from the home of a parent as a result of a finding that the child was dependent and neglected, and "for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable effort[] to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." *Id.* In evaluating those efforts, we are concerned with the time period from August 20, 2014, to December 19, 2014.

We conclude that DCS failed to meet its burden of proof on the question of reasonable efforts. The trial court found that "DCS made reasonable efforts throughout this matter but specifically made reasonable efforts during the four months following the removal . . . to assist [Father] . . . in the establishment of a suitable, stable and appropriate

---

If . . . there are not four (4) consecutive months without incarceration immediately preceding either [the four-month period immediately preceding the filing of the petition to terminate or the four-month period immediately preceding the parent's incarceration], a four-month period shall be created by aggregating the shorter periods of non-incarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time.

*Id*. § 36-1-102(1)(A)(iv) (2017).

8

home." But no evidence supports this finding. The testimony concerning when DCS assisted Father with housing is vague at best.

A DCS caseworker testified about her efforts to assist Father with housing "throughout the time that [she] had the case," which was from August 2014 through May 2015. Her answers to questions posed by counsel for DCS do not appear to be limited to just the four-month period following removal. As a result, we cannot determine when the assistance was actually provided to Father and whether the assistance was rendered within the four-month period following removal or some time thereafter. The only direct evidence of DCS's efforts in the four months following removal was the administration of a few drug screenings. Based on this record, we conclude that the juvenile court erred in terminating Father's parental rights on the ground of abandonment for failure to provide a suitable home.

b. Wanton Disregard for the Welfare of the Children

The juvenile court found that DCS had proven the fourth definition of abandonment by clear and convincing evidence against both Father and Mother. This definition of "abandonment" applies in cases in which the parent is incarcerated when the petition to terminate is filed or had been incarcerated within the four-month period preceding the filing of the petition and "contains two distinct tests for abandonment." *In re Audrey S.*, 182 S.W.3d at 865. One test examines pre-incarceration visitation and support, and the other examines the pre-incarceration conduct of the parent. The incarcerated or formerly incarcerated parent is deemed to have abandoned a child if he or she:

> either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). The juvenile court found that Mother and Father had both engaged in conduct prior to incarceration that exhibited a wanton disregard for the children's welfare.

Father was incarcerated for part of the four months preceding the filing of the petition to terminate, and Mother was incarcerated when the petition was filed. The issue here is whether the parents' pre-incarceration conduct exhibited a wanton disregard for the children's welfare.

"Wanton disregard" is not a defined term, but "actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the

intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). The court may consider all evidence relevant to determining "whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. In *In re Audrey S.*, we held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

On appeal, Mother does not dispute the trial court's findings as to her criminal convictions. Mother argues, however, that we should decline to follow our previous approach to wanton disregard in *In re Audrey S.* because it is "incorrect." Instead, Mother asks that we hold that wanton disregard requires "the parent [to have] done something that the courts find unforgivable" such as "conduct that is so egregious that it forever brands that parent as unfit." We decline to do so.

The parents next argue that the children were not in their care or custody when they engaged in criminal behavior and, thus, their behavior did not put the children in any danger. Although engaging in criminal behavior in the children's presence certainly is relevant as to whether there was wanton disregard, we disagree that the exhibited behavior must be in a child's presence. On several occasions, we have held that a parent can engage in conduct exhibiting wanton disregard for the welfare of the child even during pregnancy so long as the parent knows of the child's existence. *See, e.g.*, *In re Jeremiah N.*, No. E2016-00371-COA-R3-PT, 2017 WL 1655612, at *6 (Tenn. Ct. App. May 2, 2017), *perm app. denied*, (Tenn. July 21, 2017) (affirming the ground of wanton disregard when, after father learned of the mother's pregnancy with the child but before the child's birth, he continued to engage in criminal behavior and was convicted of the offense for which he was currently incarcerated); *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *9 (Tenn. Ct. App. May 28, 2014) ("The offenses for which [f]ather is currently incarcerated—possession of cocaine with intent to sell, unlawful possession of a firearm, and others—were committed while [m]other was pregnant with [the child]."); *In re O.J.B.*, No. W2009-00782-COA-R3-PT, 2009 WL 3570901, at *5 (Tenn. Ct. App. Nov. 2, 2009) (affirming the ground of wanton disregard because the child was born with cocaine in her system and mother pled guilty to several criminal charges after the child's birth); *cf. In re Mac L.*, No. E2016-00674-COA-R3-PT, 2016 WL 6876498, at *7 (Tenn. Ct. App. Nov. 22, 2016) (concluding that father's pre-incarceration conduct need not directly impact the child in a negative way to support a finding of wanton disregard). As a result, we find Mother's and Father's arguments on this point unavailing.

From our review of the record, we agree that clear and convincing evidence supports the trial court's finding of abandonment by wanton disregard. Jaxson tested positive for opiates at birth, and Mother did not begin to address her drug addiction until one year after his birth. Moreover, rather than work on regaining custody of her children, Mother engaged in criminal conduct that led to her arrest almost on a continual basis since May 2014. Before the children's removal into DCS custody, Mother received three convictions. Even after the children's removal into DCS custody, and Mother was told to not incur new criminal charges in order to regain custody of the children, Mother continued engaging in criminal behavior, receiving six more convictions. Mother also violated her probation. Based on her actions, Mother spent approximately half of 2015 in jail, rendering her unable to visit her children, let alone care for them.

Father voluntarily left the children with his mother and her husband, presumably to be with Mother. After the children were removed from the home, he received three convictions in 2015, which include public intoxication and indecent exposure. At a meeting in March 2015, Father admitted that he had an outstanding violation of probation. Father admitted that he was addicted to alcohol after he was arrested four times in six months. Although he was aware of his responsibilities, Father admitted that he did nothing the first year the children went into state custody. Father failed a breathalyzer test in May 2015 right before a scheduled visitation with the children.

2. Substantial Noncompliance with the Requirements of the Permanency Plans

The juvenile court found Mother and Father failed to substantially comply with their responsibilities in the permanency plans. *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014)). If the permanency plan requirements are reasonable, the court must then determine if the parent's noncompliance was substantial. *Id.* at 548-49. The unsatisfied requirements must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

We agree with the juvenile court that the plan requirements were reasonable and related to the conditions that necessitated the removal of the children. DCS removed the children because of concerns about drug use, criminal behavior, and residential and financial instability. The permanency plans required Mother and Father to be law-abiding citizens, follow all the probation requirements, notify DCS of any legal involvement, not incur any new charges, maintain contact with DCS and any other providers involved in the case, keep their contact information current with all necessary parties, obtain appropriate housing, obtain a legal means of support, participate in

11

parenting classes and demonstrate skills during visitation, develop a budget, complete a transportation plan, complete a child care plan, not associate with any known drug users, complete intensive outpatient programs for substance abuse and follow all recommendations, submit to random drug screens and pill counts, complete a clinical assessment with parenting and alcohol and drug components and follow all recommendations, participate in medication management, and participate in individual counseling. Mother was also required to follow-up with her doctors about her prescriptions and to ensure she was on the right medications, and Father was required to address anger management and anything else recommended by his counselor in individual counseling.

Next, we must determine whether each parent's noncompliance is substantial in light of the importance of the requirements to the overall plan. *In re Valentine*, 79 S.W.3d at 548-49. Our focus is on the parents' efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). "[A] permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives." *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). "[P]arents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis." *Id.*

Parents first argue that none of the three permanency plans contained a statement of responsibilities. The parental termination statute provides that parental rights may be terminated where there "has been substantial noncompliance by the parent . . . with *the statement of responsibilities* in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2) (emphasis added). "[T]he statement of responsibilities serves a substantive purpose." *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *13 (Tenn. Ct. App. Sept. 14, 2012). "If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities." *Id.*

We find the argument unavailing for at least two reasons. First, Mother and Father did not testify that they were confused about what they had to do in order to regain custody of the children. *See In re Abigail F.K.*, 2012 WL 4038526, at *13 (considering the evidence on substantial compliance even though there is no statement of responsibilities in the permanency plan because "there is no dispute on appeal about what most of Mother's responsibilities were under the plan"). In fact, just a couple of months before trial, parents began completing tasks in the permanency plan, sometimes without informing DCS that they were doing so. Mother and Father also admitted at trial that they understood their responsibilities under the plans. Rather than blaming their

confusion as the parents did in *In re Abigail F.K.*, they both blamed their failure to comply with the plan requirements on being homeless and on lack of support.

Second, even if Mother or Father had testified to confusion regarding their responsibilities, based on our review, Mother's and Father's responsibilities under the permanency plans were clear. The "Action Step(s)" section under each area of concern informs the parents of the steps that must be taken to regain custody of their children. The form states explicitly that "both the desired outcomes and action steps . . . together comprise the responsibilities of the parents[.]" It was not necessary for the permanency plans to include a specific heading entitled "statement of responsibilities" so long as the responsibilities of the parents were clearly communicated. The responsibilities were clearly communicated here, and the responsibilities from one plan to the next remained largely unchanged.[7] *Cf. In re Navada N.*, 498 S.W.3d at 604-05 (vacating the trial court's finding of sufficient proof of substantial compliance based on lack of clear statement of responsibilities and the "myriad, varied plans put in place over the years in this case.").

We conclude that clear and convincing evidence supports the finding that both Mother and Father failed to substantially comply with the permanency plans. The parents concede that they substantially failed to comply with the requirements of the first two permanency plans.[8] Our review of the record shows that, prior to the filing of the termination petition, the parents only completed their clinical assessments and two hours each of individual counseling.

After the filing of the petition to terminate parental rights, however, parents began completing the tasks on the permanency plans. Parents were even submitting proof of completion on the third day of trial. Specifically, the parents obtained housing, obtained jobs, bought a car, and completed intensive outpatient programs and parenting classes. But responsibilities remained unfinished. They were still in the process of participating in couples counseling. Among other things, Mother had not begun individual counseling, and Father had not completed his psychological assessment.

---

[7] From the first permanency plan to the second, DCS added recommendations from Mother's and Father's clinical assessments.

[8] Mother argues that the trial court should have allowed her to reopen the proof so that she could show her compliance with the third permanency plan. Specifically, Mother sought to show her efforts in the months *after* the proof was closed. The decision to reopen proof is within the trial court's discretion. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 149 (Tenn. 1991). "[T]he decision of the trial judge . . . will not be set aside unless there is a showing that an injustice has been done." *Id.* (quoting *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)). Because there has been no showing that an injustice has been done, we conclude that the trial court did not abuse its discretion in denying Mother's motion to reopen the proof.

While we commend Mother and Father for their belated efforts and we hope that they will continue, under the circumstances of this case, we conclude the efforts came too late. *See In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003) (noting that improvement can come "[t]oo little, too late"). The young children in this case had been in foster care over a year before the parents made any serious effort at fulfilling their responsibilities.

3. Persistence of Conditions

The juvenile court also found termination of Father's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). The question before the court, therefore, is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

> This ground authorizes termination of parental rights when:
>
> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

14

Here, the children were removed for more than six months from Father's home by court order adjudicating them to be dependent and neglected. According to the order, Father stipulated to the following conditions that led to the children's removal from his care: residential instability, financial instability, and without a parent due to incarceration. Under the facts of this case, substance abuse and criminal behavior were also conditions that in all reasonable probability would cause the children to be subjected to further abuse or neglect if they still persisted.

As to the element of whether conditions persisted, the juvenile court determined that the conditions which led to the children's removal or other conditions that in all reasonable probability would cause the children to be subjected to further abuse or neglect still persisted, preventing the children's safe return to Father's care. The juvenile court found that "even with DCS continuing to locate, engage and work with [Father], and all of the community support [he] received at the onset of this case, [he] did not obtain housing until February 1, 2016 and [he] allegedly found [a] job[] at the end of 2015."[9]

The trial court analysis improperly focused on Father's efforts rather than whether the conditions that led to the children's removal still persisted.[10] Upon release from incarceration in August 2015, Father moved into transitional housing with Doors of Hope and then moved into his current residence in January/February 2016. Father had had a place to live since August 2015 and had been working since September 2015. DCS conducted a home visit but did not make any adverse findings as to the condition of the townhouse besides the odor of smoke at the entrance. Even if the juvenile court rejected Father's testimony that he had been working since September 2015, pay stubs submitted to DCS reflected that he had had a job at least since November 2015. The proof showed that, as of the date of trial, Father had both housing and a job.

Father had been off probation since January 2016, and DCS presented no evidence of additional criminal charges. However, the evidence of Father's sobriety was mixed. Father last failed a drug screen in September 2015, when he tested positive for THC.[11] According to the testimony of two different DCS employees, as late as December 2015, Father appeared for a Child and Family Team Meeting smelling of alcohol. Although

---

[9] The trial court also found that Father did nothing on his own and that his accomplishments were the result of others' kindness. But the focus should have been on the result of Father's efforts.

[10] A parent's efforts or lack thereof is the focus of another ground for termination—substantial non-compliance with the permanency plans—as discussed earlier in this opinion.

[11] THC, or tetrahydrocannabinol, "is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

15

Father disputed this, contending that the last time he drank alcohol was in August 2015, the trial court apparently credited the testimony of the DCS employees. On the other hand, after the failed drug screen in September 2015, Father exercised visitation, indicating he passed all subsequent drug screens. Father also completed an intensive outpatient program for his substance abuse issues.

Based on this record, we conclude the evidence was less than clear and convincing that the conditions which led to the children's removal or other conditions that in all reasonable probability would cause the children to be subjected to further abuse or neglect still persisted. Because termination of parental rights on the grounds of persistence of conditions requires clear and convincing evidence of each of the statutory elements, we need not address the remaining elements.

## B. BEST INTEREST OF THE CHILDREN

As DCS proved at least one ground for termination of parental rights against each parent, we turn to the issue of whether termination is in the best interest of the children. Because "[n]ot all parental misconduct is irredeemable, . . . Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i)[12] lists nine factors that

_____

[12] The statutory factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances, or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

16

courts may consider in making a best interest analysis. The focus of this analysis is on what is best for the child, not what is best for the parent. *Id.* at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

We conclude that clear and convincing evidence supports the juvenile court's conclusion that termination of Mother's and Father's parental rights was in the children's best interest. The juvenile court found multiple best interest factors weighed against Mother and Father. The court focused on the parents' behavior during the pendency of this case including their "sprees of criminal conduct" and struggles with addiction. The court determined that Mother and Father had failed to make a lasting adjustment in their lives and, even after reasonable efforts by DCS, a lasting adjustment was not reasonably possible in the near future. *See* Tenn. Code Ann. § 36-1-113(i)(2).

Although both Mother and Father had made adjustments in their circumstances and conditions since removal of the children, there were some troubling indications that the adjustments may not be lasting. During the course of trial, Mother appeared for a scheduled visitation with the children. Mother was given three attempts to produce a sufficient urine sample so that a drug screen could be performed, but she was unable to do so.

Father failed a drug screen as recently as September 2015. And in December 2015, Father appeared for a Child and Family Team Meeting smelling of alcohol.

The trial court also found that the parents did not maintain regular visitation with the children. *See* Tenn. Code Ann. § 36-1-113(i)(3). The evidence does not preponderate against this finding, which weighs in favor of termination. Here, parents were each allowed a *minimum* of two visitations of two hours' duration per month. Unfortunately,

---

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

they could not take full advantage of visitation because of failed drug screens, incarcerations, or failure to reschedule cancelled visits. In Mother's case, she was not able to visit with the children for over a year.

As a result of these sporadic visits, the parents had little relationship with the children. *See id.* § 36-1-113(i)(4). When the children were removed into DCS custody, Isabella was almost two years old, and Jaxson was almost one year old. As of the date of trial, the children had spent nineteen months in foster care. Troublingly, during this period of time, neither parent had advanced to unsupervised visitation.

Isabella identified the foster parents as her "mommy" and "daddy." The record reflects that the children did not exhibit the same comfort level with Mother and Father as they did with the foster parents. *See id.* § 36-1-113(i)(5). The children were happy, healthy, and adjusting well with the foster family. The foster father testified to his love for the children and to the foster family's desire to adopt them. These facts also weigh in favor of termination.

Finally, the trial court found that neither parent has made any child support payments. *See id.* § 36-1-113(i)(9). The evidence does not preponderate against this finding, which also weighs in favor of termination. Both parents admitted that they never paid child support although they had the ability to pay since January 2016.

**IV.**

Based on the concession of DCS and our review of the record, we vacate the juvenile court's findings that termination of Mother's parental rights was appropriate based upon the grounds of abandonment by failure to provide a suitable home and persistence of conditions and the finding that termination of Father's parental rights was appropriate based upon the ground of abandonment by failure to visit. Based on our review of the record, we also vacate the juvenile court's findings of abandonment by failure to provide a suitable home and persistence of conditions as to Father. Still, the record contains clear and convincing evidence to support terminating Mother's and Father's parental rights on the grounds of abandonment by wanton disregard for the welfare of the children and substantial noncompliance with the permanency plan requirements. We further conclude the record contains clear and convincing evidence that termination is in the children's best interest. Thus, we affirm the judgment of the juvenile court terminating the parental rights of Mother and Father as modified by this opinion.

_____
W. NEAL MCBRAYER, JUDGE

18